UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ALISHA A. KELLERMAN,

                Plaintiff,

v.                                                       Case No. 5:08-cv-373-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                Defendant.
_____

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income. (Doc. 1.) The Commissioner has answered (Doc. 9) and both parties have filed briefs outlining their respective positions. (Docs. 20 & 21.) For the reasons discussed below, the Commissioner's decision is due to be **REVERSED and REMANDED.**

## I. PROCEDURAL HISTORY

On August 16, 2005, Plaintiff filed an application for Supplemental Security Income ("SSI") claiming a disability onset date of June 1, 1999. (R. 74-76.)[1] Plaintiff's application was denied initially and upon reconsideration. (R. 21-29, 38-44.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner,

---

[1] The relevant period in Plaintiff's claim for SSI is the month in which she filed her SSI application (August 2005) and through the date of the ALJ's decision (May 14, 2008.) See 20 C.F.R. §§416.330, 416.335; see also Casey v. Secretary of Health and Human Services, 987F.2d 1230, 1233 (6th Cir. 1993)("The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date.")

and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 37.)  On March 10, 2008, the ALJ conducted Plaintiff's administrative hearing.  (236-61.)  On May 14, 2008, the ALJ issued a decision unfavorable to Plaintiff. (R. 11-20.)  Plaintiff timely filed a request for review with the Appeals Council (R. 7), which denied her request for review (R. 4-6.)  On September 4, 2008, Plaintiff filed the instant appeal to this Court. (Doc. 1.)

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the

---

[2] See 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from
(continued...)

district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6] The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is

---

[5](...continued)
evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

disabled.[12] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of

---

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[17] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

4

exertion.[18] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

### III. **SUMMARY OF THE RECORD EVIDENCE**

Plaintiff was twenty-one (21) years old at the time of the hearing. (R. 240-41.) Plaintiff completed half of tenth grade (R. 383) and has worked as a receptionist and file clerk. (R.108, 240-41.) Plaintiff contends that she is unable to work due to Raynaud's, back pain, right ankle pain, scoliosis, kidney problems, and vasovagal episodes. (R. 243-46.)

---

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[19] Walker at 1003.

[20] Wolfe at 1077-78.

[21] See id.

[22] See Doughty at 1278 n.2.

Plaintiff was treated at several pediatric speciality clinics at the University of Florida – Nephrology Clinic, Rheumatology, and Cardiology/ Electrophysiology Clinic. Plaintiff was treated for recurrent urinary tract infections at the Nephrology Clinic. (R. 143-44, 150-51, 162-63, 167-68, 169-70.) Plaintiff was diagnosed with chronic pyelonephritis[23] secondary to prior history of recurrent urinary tract infections and history of bilateral vesicoureteral[24] reflux. (R. 169-70.) On January 27, 2004, it was noted that Plaintiff was being treated by a local doctor for chronic fatigue syndrome and that her current medications included ProAmatine for chronic fatigue syndrome. (R. 169-70.) As of June 27, 2006, Plaintiff had not had a documented urinary infection in two years, she had been off urinary antibiotic prophylaxis for a year and she was completely asymptomatic. (R. 143.) On December 19, 2006, Plaintiff was completely asymptomatic and it was noted that she had not had a urinary tract infection for almost three years; Plaintiff was discharged from the clinic. (R. 217-18.)

Plaintiff was treated at the Cardiology/ Electrophysiology Clinic by Don Marangi, M.D. for episodes of vasovagal physiology[25] and autonomic dysfunction. On November 3, 2004, Plaintiff reported that she has continued to experience episodes of vasovagal

---

[23] Chronic inflammation of the renal parenchyma and pelvis resulting from bacterial infection, characterized by calyceal deformities and overlying large flat renal scars with patchy distribution. See Stedman's Medical Dictionary at 1608 (28th Edition.)

[24] "Vesicoureteral" means relating to the bladder and the ureters. See Stedman's Medical Dictionary at 2121 (28th Edition.)

[25] "Vasovagal" relates to the action of the vagus nerve upon the blood vessels." Stedmans Medical Dictionary at 2094 (28th Edition.)

6

physiology, some of which have resulted in presyncope and syncope[26], and dizziness on a regular basis. (R. 164-66.) One of the episodes of syncope was in anticipation of receiving a tattoo and another occurred during warm weather following the hurricanes and the absence of electricity and air conditioning. Plaintiff was treated with ProAmatine and "Tier 1 therapy" – i.e., advised to avoid standing in one position for extended periods of time; avoid warm, close, crowded quarters; avoid dehydration; decrease dietary caffeine; and increase dietary sodium chloride. (R. 164-66.) On February 9, 2005, Plaintiff reported a significant increase in the frequency of her clinical events. (R. 153-54.) On September 7, 2005, Plaintiff reported intermittent episodes of vasovagal physiology but denied any episodes that had progressed to complete loss of consciousness; she also reported occasional headaches and fatigue. (R. 155-56.) Plaintiff was advised that episodes of vasovagal physiology are more likely to occur "in the course of warm or summer weather." On February 22, 2006, Plaintiff reported several episodes of vasovagal physiology, none of which progressed to complete loss of consciousness, as well as fatigue, malaise, subjective tachycardia and mild deterioration in consciousness since her last evaluation. (R. 147-48.) Plaintiff reported that she engages in regular physical activity without limitation.

On October 18, 2006, Plaintiff reported exacerbation of her clinical complaints in association with vasovagal physiology – including, fatigue and malaise – which could be associated with her recent breast reduction surgery. (R. 219-21.) It was noted that Plaintiff's condition was "adequately maintained" and that medications were not

---

[26]"Syncope" means loss of consciousness and postural tone caused by diminished cerebral blood flow. See Stedman's Medical Dictionary at 1887 (28th Edition.)

7

indicated at that time. On August 8, 2007, Plaintiff was seen by Randall M. Bryant, M.D. and she reported occasional dizziness but denied any true syncope or presyncope. (R. 211.) She noted that her most profound episode occurred following witnessing the accidental death of her dog. (R. 211.) Dr. Bryant's impression was "[a]utonomic nervous system dysfunction with a history of syncope, presyncope and frequent dizziness" but that her symptoms have "improved markedly" and her condition has been managed by Tier 1 therapy. (R. 212.)

Beginning in January 2005, Plaintiff was treated at the Rheumatology Clinic for complaints of swelling in the fingers, wrists and elbows that improved over the course of the day and chronic pain in those joints. (R. 160-61.) It was noted that "other review of systems that is positive is chronic fatigue for last five years." On examination, there was no evidence of arthritis. It was noted that she "does have chronic fatigue and is deconditioned." The doctor prescribed Naprosyn, physical and pool therapy, and Elavil to regulate her sleep cycle. On June 30, 2005, Plaintiff reported that swelling and joint pain was better with medication but that she still has intermittent pain in her ankles and fingers. Plaintiff reported fatigue and nausea secondary to vasovagal syncope. (R. 157-58.) The examiner, Melissa E . Elder, M.D., Ph.D., opined that Plaintiff's joint pains were related to joint hypermobility syndrome and that there was no evidence of systemic autoimmune disease such as systemic lupus erythematosus or juvenile arthritis. On February 9, 2006, the impression was mild benign joint hypermobility syndrome with no evidence of SLE or arthritis. (R. 149.) Plaintiff was prescribed Naprosyn, Prevacid and Lunesta for disordered sleep and directed to continue physical therapy.

8

On August 25, 2006, Plaintiff was referred to physical therapy for chronic right foot/ankle pain and chronic hand/finger pain with stiffness. (R. 152.) On February 7, 2007, Plaintiff reported pain in the right foot extending to her ankle, discoloration of both feet, occasional numbness and decreased temperature of both hands and denied any swelling or morning stiffness of any of her joints. (R. 214-15.) The examiner noted that Plaintiff's complaints were more consistent with Raynaud's and she was prescribed physical therapy with a TENS unit and Procardia.

On August 7, 2006, Plaintiff had breast reduction surgery due to neck and back pain. (R. 216, 225-30.) Although Plaintiff initially reported improvement, on August 27, 2007, she reported sharp pain starting at her shoulder blades down into her lower back with radiation into her arms and legs. (R. 209-10.) The back pain was attributed to Plaintiff's large breasts and scoliosis. On August 27, 2007, an X-ray of Plaintiff's thoracic spine was normal (R. 231); and an x-ray of her lumbar exam was normal except for Grade 1 anterolisthesis of L5 on S1. (R. 232.) On December 14, 2007, MRI examinations of Plaintiff's thoracic spine, lumbar spine and sacrum were negative. (R. 233-35.)

On September 25, 2006, Plaintiff reported to an examiner at an outpatient clinic at Shands that she had been off of medication for depression for one year and she wanted to go back on it. (R. 222-23.) She reported feeling tired and disinterested in activity. Prozac was prescribed and Plaintiff was directed to return in one week related to her depression. There is no record of Plaintiff returning for treatment one week later. However, on August 27, 2007, an examiner noted that Plaintiff was taking Prozac, but

9

the examiner did not diagnose depression, note any complaints or symptoms of depression, or note a prior history of depression. (R. 209-10.)

There are two physical RFC assessments completed by non-examining state agency doctors – James J. Green, M.D. on December 21, 2005 (R. 193-200) and James Andriole, D.O. on August 16, 2006. (R. 201-08.) Both doctors agreed that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; push and/or pull without limitation; and never climb ladders/ropes/scaffolds. Green further found that Plaintiff should avoid moderate exposure to hazards and avoid concentrated exposure to extreme heat, while Andriole found that Plaintiff should be limited to occasionally climbing ramp/stairs and balancing and should avoid concentrated exposure to hazards.

At the hearing on March 10, 2008, Plaintiff testified that she completed half of tenth grade and then dropped out due to doctor's appointments, fatigue and not being able to concentrate. (R. 241.) Plaintiff testified that she is working on getting her GED. (R. 248-49.) Plaintiff testified that she is unable to work due to Raynaud's, which makes her hands hurt and makes it hard to pick up things; back pain; ankle pain; scoliosis, dizziness and feeling light headed. (R. 243-44.) Plaintiff testified that she has been diagnosed with chronic fatigue syndrome and that due to her fatigue she has to lay down once or twice per day for thirty minutes to an hour. (R. 253-54.)

On a typical day, Plaintiff wakes up between 10:00 and 11:00 a.m., takes a shower, eats breakfast, and then plays with her dog, walks around the mall, visits friends, uses the computer, watches television or goes to a movie. (R. 246-47, 248.)

Plaintiff is able to take care of her personal hygienic needs. (R. 247.) She does some cooking, tries to clean the bathroom, cleans her room, and helps fold the laundry. (R. 248.) Plaintiff collects "Tinkerbell stuff" and likes to play with her dog. (R. 248.) Three or four times per week, Plaintiff is too tired to drive and she has her mom, boyfriend or a friend drive her. (R. 248.) Plaintiff testified that her breast reduction helped a little with her back pain (R. 249.) She also reported that she had not had a urinary tract infection in a year or more. (R. 250.) Plaintiff testified that a couple weeks earlier she almost passed out but was able to lay down and feel better. (R. 250.) A month earlier she actually passed out (R. 250). Plaintiff testified that these incidents had become more common since she was taken off of her medication– she reported having at least 40 episodes of dizziness within the past year and actually passing out on 15 occasions. (R. 250-51.) After passing out, Plaintiff would lay down and put a cold compress on her face. (R. 250.) She did not go to the hospital. (R. 250.) Plaintiff testified that she has not had insurance since she turned 21 years old and that she is unable to pay out of pocket for medications. (R. 252-53.) Plaintiff testified that she could not continue her last job as a receptionist in a doctor's office because she was too tired and she could not sit or stand for very long. (R. 254-55.)

Randolph Salmons, a vocational expert, testified at the hearing that assuming an individual – who is 21 years old, with the education and past work as described for Plaintiff; who could perform sedentary work, with a sit/stand option; could occasionally climb and balance; could never climb ladders, ropes or scaffolds; should avoid even moderate exposure to hazards; and should avoid concentrated exposure to heat – that individual would be able to perform the requirements of representative occupations such

as receptionist (DOT #739.687-066) and assembly worker (DOT #754.684-018), both of which are sedentary with an SVP of 2. (R. 255-61.) However, Mr. Salmons testified that if that individual also had to lie down one to two hours during the work day due to chronic fatigue, that would eliminate all jobs.[27]

In his review of the record, including Plaintiff's testimony and the medical records from several health care providers, the ALJ determined that Plaintiff suffered from Raynaud's, right ankle pain, chronic pyelonephritis, and chronic fatigue (R. 13.) However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4. (R. 13-16.)

The ALJ then found that Plaintiff retained the RFC to perform sedentary work as defined in CFR 416.967(a), with a sit/stand option and with additional restrictions of being able to occasionally climb and balance. (R. 16.) The ALJ further found that Plaintiff should never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to heat; and should avoid even moderate exposure to hazards.

After finding that Plaintiff had no past relevant work, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. Thus, the ALJ found that Plaintiff was not disabled. In reaching this conclusion, the ALJ relied upon the testimony of the vocational expert.

---

[27] The ALJ asked if the individual could work if you add that she had to lie down one to two hours during the workday daily, experienced dizziness or syncope up to one time per week in an unpredictable fashion, and had an inability, due to scoliosis and back pain, to stand for more than two hours, or up to two hours in an eight hour work day. (R. 260.) The VE responded, "[p]robably not, because I think the key element in that hypothetical is your description of having to lie down one to two hours daily during the work schedule.. . That would eliminate all the jobs." (R. 260.)

## IV. **DISCUSSION**

### A.   *The ALJ did not err in her consideration of Dr. Marangi's opinions*

Plaintiff argues that the ALJ failed to evaluate properly the opinion of Dr. Marangi and failed to include Dr. Marangi's limitations in her assessment of Plaintiff's RFC. Dr. Marangi treated Plaintiff at the University of Florida Pediatric Cardiology/ Electrophysiology Clinic. Dr. Marangi treated Plaintiff with "Tier 1 therapy" – which required that Plaintiff should avoid standing in one position for extended periods of time and should avoid warm, close, crowded quarters. (R. 153, 155, 219.)  Although the ALJ did not explicitly discuss these opinions, the ALJ's RFC assessment, nevertheless, is consistent with Dr. Marangi's opinions and, thus, there is no reversible error.

Plaintiff argues that the ALJ rejected and did not include in her RFC finding Dr. Marangi's opinion that Plaintiff "avoid standing in one position for extended periods of time."  However, the ALJ specifically found that Plaintiff was limited to sedentary work with a sit/stand option.  Sedentary work requires no more than two hours of standing or walking in an eight-hour workday.[28]  When combined with the sit/stand option, Plaintiff would not be required to stand in one position for extended periods of time.

Inexplicably, Plaintiff argues that this limitation actually pertains to "her need to alternate *sitting and walking* – not alternate sitting and standing."[29]  However, there is nothing in Dr. Marangi's opinions or treatment notes suggesting that Plaintiff needs to alternate sitting and walking, and not sitting and standing.  Indeed, Dr. Marangi never provided any explanation regarding his opinion that Plaintiff should avoid standing in

---

[28] 20 C.F.R. §416.967(a); SSR 96-9p

[29] Doc. 20 at 7.

13

one position for extended periods of time.  Accordingly, the ALJ's RFC finding encompassed Dr. Marangi's opinion that Plaintiff "avoid standing in one position for extended periods of time."

Plaintiff also argues that the ALJ failed to consider Dr. Marangi's opinion that Plaintiff should "avoid warm close crowded quarters."  The ALJ found that Plaintiff should avoid concentrated exposure to heat. (R. 16)   While Dr. Marangi's opinion may include more limitations than just heat – i.e., warm and closed and crowded – the jobs identified by the vocational expert do not involve exposure to heat, nor do they involve "close, crowded quarters." [30]  Indeed, common sense dictates that the job of receptionist would not be performed in "close, crowded quarters."  Accordingly, Dr. Marangi's opinion that Plaintiff should "avoid warm, close crowded quarters" does not necessarily establish that Plaintiff had additional limitations on her ability to work, and even if it did, Plaintiff failed to establish that she was unable to perform the jobs identified by the vocational expert.

Plaintiff next argues that the ALJ failed to explain why she was not crediting Dr. Marangi's opinion (and the opinion of others) that Plaintiff suffers from autonomic dysfunction and vasovagal disorders.  At step two of the sequential analysis, the ALJ reviewed the medical evidence and concluded that Plaintiff had several severe impairments.  As such, "the ALJ could not have committed any error at step two because [s]he found that [Plaintiff] had a severe impairment or combination of

---

[30] See U.S. Dep't of Labor, DOT (4th ed. 1991) §237.367-038 (Receptionist), 1991 WL 672192; §739.687-066 (Compact Assembler), 1991 WL 680189;  §754.684-018 (Bit Shaver), 1991 WL 680364.

14

impairments and moved on to the next step in the evaluation, which is all that is required at step two."[31]

Morever, although the ALJ did not identify autonomic dysfunction and vasovagal disorders as severe impairments at step 2 of the sequential analysis, the ALJ explicitly considered these impairments in her RFC analysis.  After considering the evidence, the ALJ found that Plaintiff's condition limited her to sedentary work with a sit/stand option with the further limitations of occasional climbing and balancing;  never climbing ladders, ropes, or scaffolds; avoiding concentrated exposure to heat; and avoiding even moderate exposure to hazards.   Plaintiff has failed to show that these diagnoses, whether severe or not severe, caused any additional limitations on her ability to work.

Accordingly, the ALJ did not err in his evaluation of the opinions of Dr. Marangi.

### B. The ALJ erred in her consideration of Plaintiff's chronic fatigue

Plaintiff next argues that the ALJ failed to properly consider her chronic fatigue syndrome.  The Court agrees.

At step 2 of the sequential analysis, the ALJ found that "chronic fatigue" was a severe impairment.[32]  The medical records show that Plaintiff consistently reported fatigue to her health care providers – including on  January 2004 (R. 170); February 2005 (R. 154); June 2005 (R. 157); September 2005 (R. 155); February 2006 (R. 147); October 2006 (R. 219-21); August 2007 (R. 211).  Moreover, Plaintiff testified that she

---

[31] Council v. Barnhart, No. 04-13128, at *4 (11th Cir. 2004) (per curiam) (unpublished), a copy of which is  attached to the Commissioner's Memorandum.

[32] Because the ALJ discussed "chronic fatigue syndrome" throughout her decision, the Court assumes that the ALJ inadvertently left off the word "syndrome."  Indeed, in her Decision the ALJ noted several times that Plaintiff had been diagnosed with chronic fatigue syndrome and noted Plaintiff's testimony that she had been diagnosed with chronic fatigue syndrome. However, either way, the ALJ erred because she failed to consider the impact of Plaintiff's fatigue on her ability to work.

15

has been diagnosed with chronic fatigue syndrome and that due to her fatigue she has to lay down once or twice per day for thirty minutes to an hour. (R. 253-54.) Presumably, based upon this testimony, the ALJ asked the VE in a hypothetical whether needing to lie down one to two hours during the work day would impact Plaintiff's ability to work. (R. 260.) The VE testified that this additional limitation would eliminate all jobs. (R. 260.)

Then, despite finding that Plaintiff's chronic fatigue is a severe impairment, discussing the numerous times Plaintiff reported fatigue to health care providers, and asking the VE a hypothetical related to Plaintiff's reported fatigue, the ALJ failed to evaluate (or even mention) how, if at all, Plaintiff's fatigue impacts her ability to work during an 8-hour day. This is especially critical, where as here, there is record evidence that Plaintiff's fatigue imposed an additional limitation on her ability to work – i.e., that she must lay down one to two hours during the work day – and the VE testified that this additional limitation would eliminate all jobs.

Accordingly, for this reason, the case is due to be reversed and remanded for the ALJ to properly evaluate and discuss how, if at all, Plaintiff's chronic fatigue impacts her ability to work an 8-hour day.[33]

### C. The ALJ did not err in her consideration of Plaintiff's alleged mental impairment

Finally, Plaintiff argues that the ALJ failed to evaluate her alleged mental impairment in the manner required by applicable regulations and binding Eleventh Circuit case law. This argument is without merit.

---

[33] Vega v. Commissioner, 265 F.3d 1214, 1219-20 (11th Cir. 2001)("[i]t is clear to us that the ALJ did not properly consider the diagnosis of CFS [Chronic Fatigue Syndrome] or evaluate the effect the CFS symptoms had on [Claimant's] ability to work.")

16

The Eleventh Circuit has held that it is reversible error if the claimant presents a colorable claim of a mental impairment and the ALJ fails to comply with the regulations for evaluating mental impairments.[34] Here, Plaintiff failed to provide evidence establishing a colorable claim of a mental impairment. Plaintiff cites only one medical record related to depression – a September 25, 2006 treatment note in which Plaintiff reported that she has been off of medication for depression for one year and she wanted to go back on it; Prozac was prescribed and Plaintiff was directed to return in one week related to her depression. (R. 222-23.) On August 27, 2007, an examiner noted that Plaintiff was taking Prozac, but the examiner did not diagnose depression, note any complaints or symptoms of depression, or note a prior history of depression. (R. 209-10.) Prozac was listed as a current medication but Plaintiff does not cite any other medical evidence showing that she even complained of depression. Moreover, neither Plaintiff nor her representative even mentioned depression at the hearing. Because Plaintiff failed to provide evidence establishing a colorable claim of a mental impairment, the ALJ was not required to comply with the regulations for the evaluation of mental impairments.[35]

## V. CONCLUSION

In view of the foregoing, the decision of the Commissioner is due to be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner for the Administrative Law Judge to properly consider how, if at all,

---

[34] See Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005.)

[35] 20 C.F.R. §416.920a entitled, "Evaluation of mental impairments" is the applicable regulation for Supplemental Security Income. Plaintiff cites to §404.1520a – the section which relates to disability insurance, and not Supplemental Security Income.

17

Plaintiff's chronic fatigue impacts her ability to work an 8-hour day; and conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on October 28, 2009.

*[signature]*
GARY R. JONES
United States Magistrate Judge

Copies to:

    All Counsel